## Wallace, Appellant, *v.* Smith.

[Marked to be reported.]

*Deed—Defeasance—Evidence—Equity—Laches.*

While a conveyance of land, prior to the act of 1881, intended to operate merely as a security for money, is in effect a mortgage, yet the evidence of such intention must be clear, precise and indubitable.

If the indebtedness which constituted the conveyance is satisfied, the mere fact that the grantee gave the grantor an option to repurchase will not make the transaction a mortgage.

Plaintiff in 1880 made a deed to defendant on consideration that defendant would assume a mortgage on the land. No obligation or evidence of indebtedness was given by plaintiff to defendant. In 1885 defendant conveyed the property in trust for himself and children. Plaintiff leased the property in 1888 from the trustee, and made no claim until he brought suit in 1890. Plaintiff's evidence was to the effect that defendant promised to reconvey whenever plaintiff could see his way clear to give back the money. *Held,* that plaintiff's equity, if he ever had any, was very stale; that his claim was not sustained by clear, precise and indubitable evidence; and that a chancellor would not decree the deed to be a mortgage.

Argued Nov. 10, 1892. Appeal, No. 256, Oct. T., 1892, by plaintiff, John Wallace, from decree of C. P. No. 1, Allegheny Co., dismissing plaintiff's bill against Robert Smith and John Rynd. Before PAXSON, C. J., STERRETT, GREEN, WILLIAMS, McCOLLUM, MITCHELL and HEYDRICK, JJ.

Bill to have deed declared a mortgage.

The facts are found as follows by the report of the master:

" The bill sets forth in substance: (1) That on the 5th day of April, 1880, the complainant was the owner of a tract of land in McCandless township, containing fifty-nine acres and one hundred and fifty-four and one fourth perches, strict measure. (2) That complainant, on the 5th day of April, 1880, conveyed

the said tract of land to John Rynd, as security to said Rynd for the payment by him of about four thousand dollars, said real estate being worth at the time seven thousand dollars ; but that said complainant has kept and retained possession of the said farm until the present time. (3) That the arrangements made between the complainant and the said Rynd were that, whenever the complainant should pay said indebtedness assumed by the said John Rynd for the said complainant, the said Rynd should reconvey said property by deed to complainant. (4) That the said John Rynd, on the 19th day of May, 1885, by deed recorded in Deed Book, vol. 511, page 476, conveyed said realty to R. S. Smith, one of the respondents, in trust for said Rynd, he (said Smith) to manage, care for, and to take charge of the same, and that the said R. S. Smith has no interest whatsoever in said property except as trustee for said Rynd. (5) That about May 2, 1890, complainant tendered a sum of about seven thousand dollars to said Rynd, and requested a reconveyance, under the agreement, and that said Rynd approved of amount tendered, as appears by letter marked ' Exhibit A ' of the bill. (6) That said R. S. Smith is attempting to prevent a reconveyance to complainant. (7) That complainant is willing, and has been since May 2, 1890, to pay all that is due to said Rynd, and to have a reconveyance of said property. That it is the old homestead. The relief prayed for is ' that the said respondents, upon the payment by your orator of the sum of $7,000, with interest from May 2, 1890, be ordered to execute and deliver good and sufficient deed for the property described in bill.'

" To these complaints John Rynd files no answer. R. S. Smith, the trustee of Rynd, and co-respondent, answering, says the first paragraph of bill is true. The second and third are not true, for, although plaintiff did convey by deed to Rynd the land described, he did so for a consideration up to the full value of the land, upon an absolute sale, and without any agreement for redemption or reconveyance. The fourth paragraph is not true as stated, although a deed of trust was made (as hereinafter set forth). Admits the allegations of tender and request by complainant for reconveyance in fifth paragraph, but otherwise says it is untrue. As to the seventh paragraph, says he is ignorant of complainant's willingness to

pay; admits that plaintiff feels an interest in the old homestead, but believes it is due to oil developments in the vicinity.

"The sixth paragraph of answer sets out at length the deed from John Rynd to respondent, and says that the said Rynd then had a wife, Margaret Rynd, and six children, viz.: Cyrus Rynd, James Rynd, George B. Rynd, May Lindley, Amelia Wilson, and Alice Wortman, all of whom are living except the said Amelia Wilson, who has died intestate, leaving to survive her her husband, Alexander Wilson, and her three children, to wit, Mary, John, and Alexander Wilson, who are all minors; and says that he is advised and believes that the said wife and grandchildren of the defendant Rynd are necessary parties to this suit, and claims and insists that no decree be made, or further proceedings be had therein, until they have been brought in as parties hereto; and further says that the said Sarah Wallace, who was the plaintiff's mother, held the said land by plaintiff's full knowledge, and by virtue of the trust for her in the said deed expressed, until her death, in or about 1888, after which the trustee under said deed let and demised the same to plaintiff at a certain rent for the term of one year from April 1, 1889, and that the plaintiff took and held possession thereof, and is yet in possession thereof, as tenant from year to year, under me as trustee, and that plaintiff never, until shortly before the commencement of this suit, made any pretence or claim of title to or interest in said land, but, on the contrary, in the lifetime of his mother, was active in inducing and did induce respondent to spend moneys of the trust to the extent of $700 in the erection of a barn thereon; and says that he is advised and believes that by reason of his silence and acts aforesaid he is estopped from asserting any right of redemption of said land, and prays that the bill be dismissed at plaintiff's costs.

"From these allegations of facts in the bill, which are admitted to be true, or are not specifically denied in the answer, and from the testimony taken, letters, papers, and records put in evidence, the master finds the following facts: The first paragraph of complainant's bill is admitted by the answer, to wit, that the complainant, on the 5th day of April, 1880, was seised in his demesne as of fee of all that certain tract of land situate in McCandless township, Allegheny county, Pennsylvania, containing 59 acres and 154¼ perches (and fully described in the said bill), and the master finds the same as facts.

" The answer admits a portion of the second paragraph in bill, to wit, that the orator on the 5th day of April, 1880, conveyed the real estate, described in paragraph No. 1, to John Rynd, and the master finds the same as a fact. The balance of said paragraph is denied by the answer, but the master finds the same as facts, to wit, [that the real estate described in paragraph No. 1 of this bill was conveyed to John Rynd as security for the payment by him of the indebtedness of said Wallace of about $4,000,] and that plaintiff has kept and retained possession of said farm until the present time, and that said real estate at that time, to wit, April 5, 1880, was worth $7,000 at least. . . .

" The master finds as facts the allegations in the third paragraph of bill, to wit, ' that the arrangement made between the complainant and the said Rynd was that, whenever the complainant should pay said indebtedness assumed by the said John Rynd for the said complainant, the said Rynd should reconvey said property by deed to complainant.' The master is forced to this finding, as well as to the former finding, viz., ' that the real estate described in paragraph No. 1 of this bill was conveyed to John Rynd as security for the payment by him of about $4,000,' by the testimony.

" Robert Guyton, a neighbor of Mr. Rynd, says : ' I met John Rynd and John Wallace together, at Mr. Rynd's house, somewhere about April 1, 1890, and I heard a conversation there about a farm in McCandless township. Mr. Wallace brought up the conversation by saying to Mr. Rynd " he would like to have the matter settled ; that he was tired moving," or something to that effect. Mr. Rynd said " he did not want the land at the time he took it." Mr. Wallace then asked him " if they had not made an agreement at the time he (Rynd) got the land that, if Wallace was able to pay for it, he would give it up to him." Mr. Rynd said " they had such an agreement, and he was willing to fulfill his part of it, but he wouldn't do anything until he saw Mr. Smith." '

" John Rynd, one of the respondents to the bill, being called for cross-examination, says, in answer to the question : ' Did you not say to Mr. Wallace, " that any time he repaid you your money with interest, you would reconvey it to him ? " *Answer :* I wouldn't say positively, but such a conversation may have taken place.' He also says, in answer to the question :

'And do you remember saying to R. S. Smith, in a letter or note, that you had promised to retransfer the said farm, provided John Wallace paid said principal debt and interest? *Answer:* I think it was my wife wrote that letter and with my consent. *Question:* And are you still agreed to do that? A. Yes; yes.' The words, 'Yes; yes,' were animated, and indicated to the mind of the master that although age, as stated by himself, had affected his memory, it had not blurred his conception of duty. The present was clear to Mr. Rynd, the past was a little obscure; but it was obviously manifest to the master that John Rynd was satisfied that such an agreement had been made, and he saw but one course in honor towards Wallace to pursue.

"J. M. Brown says: 'I have known John Wallace all my lifetime. I have known Rynd for 35 or 40 years. I had a conversation with Rynd at different times. The biggest conversation was early last spring. He said to me at that time "he didn't want the property at all; that all he wanted was his money, and what it cost him." I heard him say at one time, "That was the agreement when I took it,"—it was the agreement at the time he took the property.'

"Louisa Wallace, wife of John Wallace, says: 'I overheard a conversation between John Rynd and John Wallace. It was in the year 1880: in February; I don't remember the date. This conversation was in the house we live in now. There was present Mr. John Rynd and Mrs. Rynd, Mr. John Wallace, father and mother. We asked Mr. John Rynd to lift the mortgage. He (Rynd) said he had too much land, but was willing to do it if we would try to redeem the place. This we consented to do. No time was set, but when we would be ready to redeem he would be ready to give us our deed back. There was then a mortgage on the place of $4,000. He was to lift it, and we were to secure him by giving him a deed of our place. It was decided to do that. Mr. Rynd said that if we would make him out a deed he would lift the mortgage.' Witness says that about four weeks ago Mr. Rynd said 'his money was all he wanted.'

"John Wallace says: 'John Rynd is my brother-in-law. He is married to my sister. It was about January 1, 1880, that I first spoke to Mr. Rynd. There was some interest due on the

Dollar Savings Bank mortgage on January 1st. I hadn't the money to pay it. It was the old homestead. I was born there, and had always lived there, only the three years I was in the army; so I went to Rynd some time along in January, and told him my situation. He (Rynd) hesitated. He said he had so much land. He (Rynd) came out with his wife to where father and mother were living at that time, and he told me there that day that he would take the farm, and he would give me a chance to redeem it at any time that I could see my way clear to do so, and all he wanted was the principal that he put into it. He said he wanted no interest on the money.' Witness says: ' There were present at that interview my father and mother, Mr. Rynd and wife, me and my wife. My father and mother are both dead. I paid on account of this debt one hundred dollars, and then I let him have a couple of cows. I think the money was paid in 1881. That was the agreement,—that at any time that I could see my way clear to give him back his money that he would transfer my farm.'

" Robert Wallace testifies : ' The conversation was in July, 1884. It was out in the grove on his (Rynd's) farm. I remarked to him that I was sorry that the old homestead had passed out of the name. He (Rynd) said : " John has the privilege of redeeming that farm at any time that he can do so. I don't want the farm ; all I want is the money that I have invested." '

" James J. McAfee says : ' He (Rynd) acknowledged that he had agreed at the time the transfer from Wallace to him was made to reconvey the old homestead to Mr. Wallace. Mr. Rynd was very anxious to do it.'

" Thus we have the testimony of some seven witnesses of unexceptional character, besides Rynd's own admissions, and the fact that he files no answer. His letter to his trustee, requesting him to carry out his agreement, as well as the attendant corroborating facts and circumstances, such as his relationship to Wallace, his ability financially, together with the inadequacy of price, all lead to the inevitable conclusion that such an agreement was made, especially as it is uncontradicted except by the answer of R. S. Smith, which is made on information and belief, and inferentially by the testimony of W. A. Lewis, Esq., as a slight review will establish. The respondent

Smith admits that he never received any information from John Rynd as to whether or not (Rynd) held the title to this property subject to a right of John Wallace to redeem and claim as a reconveyance of the same.   He says : 'I learned something from Mrs. Rynd and from John Wallace ; also from Dr. Lindley ; and possibly something from Cyrus Rynd.'   He don't say of what he was informed, except as to Wallace and Mrs. Rynd.   Nor does Dr. Lindley or Cyrus Rynd appear.   As to Mrs. Rynd, he says : ' She (Mrs. Rynd) said Mr. Rynd had agreed to transfer the property.   That the first intimation that I received of the claim of Wallace was about six months ago.'

" W. A. Lewis, Esq., called by respondents, details a series of conversation he had with Rynd prior to the transfer, none of which were in the presence of Wallace, which testimony was taken under objection ; and the master is of the opinion now, as then, that any declaration made by Rynd, not in the presence of Wallace, is incompetent.   Witness further says : ' Mr. Rynd then leased the property to John Wallace.'   In answer to question, ' Do you remember if it was drawn at the time the parties were at your office ?   *Answer :* No, sir ; it was drawn later. I don't mean to say I saw the lease executed.   I think Mr. Rynd took the lease from my office to have it executed, or I mailed it to him.   I remember this : It was agreed among the parties that they couldn't afford to pay it ; ' and finally says that Wallace did not tell him that he couldn't afford to pay it, nor did anyone else except Rynd.   And again, in answer to question, ' Are you satisfied now that Mr. Wallace did not execute the lease of these premises at any time to John Rynd, in your presence ?   *Answer :* No ; but I do not think he did.' Witness further says: 'I think that the only time that Wallace was at my office was the time the deed was executed.' ' No, I don't think that John Wallace and I ever had any conversation about this matter. . . . I did not have much conversation with Mrs. Wallace, if any.'   The whole of Mr. Lewis's testimony establishes what John Rynd said in answer to Mr. Bryant's question, ' Did he (Lewis) know the whole arrangement ?   *Answer :* No, I don't think he did.   He didn't know anything about buying it back from me.   He may have.   I don't recollect now.'   Lewis again says that John Wallace didn't tell him that he was selling, or had sold, that property.

' *Question:* But John Wallace did not tell you it was a sale?'
'No; he said nothing to me about it.' The entire testimony
of Mr. Lewis coincides with the testimony of Rynd and Wallace and wife, that nothing was said in his (Lewis's) presence
of any right to redeem on the part of John Wallace. Even if
the conversations Lewis had with Rynd were competent, there
was ample time between the time they took place and the
time the deed was executed to have made the arrangement.
Witness says: ' *Question:* How long before the meeting by
Wallace and Rynd at your office was it that Rynd spoke of purchasing the property? *Answer:* I couldn't say. Q. Was it as
much as two or three weeks? A. I couldn't say. Q. Could
you say whether it was as much as six weeks before? A. I
couldn't say.' Moreover, the master finds as a fact that the
lease, if drawn, was never executed. Nor was any rent ever
paid by Wallace, or demanded by Rynd. Mr. Wallace continued to occupy the premises, paid taxes, exercising all the acts
of ownership that he did previous to the transfer.

" The master finds as facts the allegations in the fourth paragraph of bill, to wit: That the said John Rynd made and executed a conveyance dated May 19, 1885, recorded in Deed
Book, vol. 511, page 476, of all said realty to R. S. Smith, subject to the following trust, to wit: 'Know all men by these
presents that I, John Rynd, of the township of McCandless,
county of Allegheny, and state of Pennsylvania, in anticipation
of the weakness, infirmities, and mistakes of age, and to secure
a judicious and safe management of my estate during my life,
notwithstanding and in consideration as well of the trusts hereafter expressed as of the sum of one dollar, to me paid by Robert S. Smith and W. C. Burchard, of the city of Allegheny,
Pennsylvania, have bargained and sold, and do hereby grant,
bargain, sell, convey, assign, and set over, unto the said R. S.
Smith and W. C. Burchard, and their heirs and assigns, all my
estate and property, real and personal, of whatsoever kind, and
wheresoever situate, excepting my goods and chattels kept or
used in or upon my house or farm, in and on which I now reside; to have and to hold the same unto and for the use of the
said R. S. Smith and W. C. Burchard, and their heirs and assigns, upon the trusts following, however, to wit: To not interfere with my free use, occupation, and enjoyment of my farm

on which I now reside, so long as I shall desire to keep it as my home, or whenever I shall again desire to make it my home; to permit Sarah Wallace to have and enjoy during her life, free of rent, the farm bought of John Wallace, (she paying the taxes thereon, and keeping the same in repair,) subject to the foregoing trusts; to take charge of all my real estate, let the same, and collect the rents thereof, paying the taxes thereon, and keeping the same in repair; to take possession of and collect and receive all my personal estate hereby conveyed, and manage and safely invest the same; out of the net income of all my estate which shall not be subject to my control or engagements, to pay from time to time such sums as shall be proper for the liberal and comfortable support and maintenance of myself, family, and establishment, in view of my estate and condition in life, for which sums my receipt shall be sufficient voucher; to reinvest and accumulate the residue, if any, of the net income during my life, and upon my death to convey and assign the whole estate, with all accumulations, as I have by my will, heretofore made, willed regarding my estate, or, if it be revoked by me, as I shall by any will or writing in the nature thereof, hereafter to be made, direct and appoint, and, in default of such appointment, to my wife and children, now living, in such shares, and for such estate, as they would respectively have of my estate under the intestate laws of Pennsylvania in case of my death intestate, leaving all of them surviving, but my wife to receive only in case she survives me and relinquish her dower,'—the effect of which, and its bearing on the case, may more properly be considered hereafter.

" The master finds as facts the allegation in the fifth paragraph of the bill, to wit: That about May 2, 1890, the said complainant tendered to the said John Rynd the sum of seven thousand dollars, and requested a reconveyance of said property to him (said Wallace) under their original agreement; that said John Rynd approved of the amount tendered. This finding is based upon the testimony of James McAfee, John Rynd, and John Wallace. The finding as to approval is sustained by the following letter, marked ' Exhibit A,' and attached to the bill: ' Mr. R. S. SMITH—Dear Sir: Mr. Wallace has called on me with reference to the transfer and purchase of the farm formerly owned by him. In accordance with an agreement

made with him at the time of my taking and assuming his indebtedness in consideration of said transfer to me, I promised to retransfer the said farm, provided that John Wallace paid said principal debt and interest. He has now tendered me the sum of seven thousand dollars, which is the amount due. I am satisfied to make a deed to him for the said farm. John Rynd. By Margaret Rynd.' The above letter was written by Burt Wallace, and dictated by James McAfee, Esq., at Mr. Rynd's request. In dictating the letter each sentence was first approved by Mr. Rynd before it was written, and then it was read to him. Mr. Rynd then requested his wife to sign it, and also requested Mr. Wallace to deliver it to Mr. Smith.

" The master finds as a fact that prior to the filing of this bill John Wallace tendered to R. S. Smith the sum of $7,000, together with a deed, and requested a conveyance, and that R. S. Smith refused.

" The master finds as facts that in the latter part of 1887 R. S. Smith and W. C. Burchard expended the sum of $765 in the erection of a barn on the farm in dispute, Mr. Wallace furnishing the stone and doing the hauling, and that on the 1st day of April, 1889, John Wallace took a lease of the property; and further finds that Rynd had a wife and six children at the date of the execution of the trust deed to R. S. Smith, to wit, May 19, 1885."

The master recommended a decree as prayed for.

Exceptions by appellant allege that the master erred, (3) in not finding the deed an absolute conveyance; (4) in not finding the agreement at most an agreement for a future reconveyance; (5) in not dismissing the bill because no such relation as that of debtor and creditor existed; (6) in finding as in brackets above; (10) in treating the deed as a mortgage.

The court sustained above exceptions and dismissed the bill.

*Errors assigned* were (1–6) decree and dismissal of above exceptions, quoting them.

*M. A. Woodward,* for appellee.—The evidence must be direct, positive, express and unambiguous: Sower v. Weaver, 78 Pa. 443; Huoncker v. Merkey, 102 Pa. 462; Null v. Fries, 110 Pa. 521; Lances's Ap., 112 Pa. 467.

The debt must survive: Null v. Fries, 110 Pa. 521; Todd v. Campbell, 32 Pa. 250; Emery v. Marshall, 42 Leg. Int. 395.

Wallace and his wife together amount to one witness only: Sower v. Weaver, 78 Pa. 443.

The deed of trust in this case is irrevocable: Fellow's Ap., 93 Pa. 470; Perry on Trusts, 4th ed., § 104; Ellison v. Ellison, 6 Vesey, 656; Slifer v. Beates, 9 S. & R. 166; Sprague v. Woods, 4 W. & S. 192; Dennison v. Gorhring, 7 Pa. 175; Read v. Robinson, 6 W. &. S. 329; Delamater's Est., 1 Whart. 362; Reese v. Ruth, 13 S. & R. 434; Greenfield's Est., 14 Pa. 489; Stone v. Hackett, 12 Gray, 227; Merriman v. Munson, 134 Pa. 114.

No subsequent admissions or declarations of John Rynd could affect the title of the trustee. See, as to character of declarations, Robertson v. Robertson, 9 Watts, 42.

The claim is barred by laches: Heymon v. European C. R. R. Co., 7 Eq. 154; Neely's Ap., 85 Pa. 390; Evan's Ap., 81 Pa. 278; Ashhurst's Ap., 60 Pa. 290; Bisph. Eq., 4th ed., § 260.

*James Fitzsimmons, John S. Robb* with him, for appellants.— Mutual promises are not essential to the validity of a contract at common law: Justice v. Lang, 42 N. Y. 493.

The obligation depends upon the consideration, or, in other words, on the fulfillment of some expressed or implied request which is the condition of the promise: Wilson v. McClure, 50 Ill. 366; Powers v. Bumcratz, 12 Ohio, N. S. 279–290; Powers v. Fowler, 4 E. & B. 511; Oldershaw v. King, 2 H. & N. 399–517; Weaver v. Wood, 9 Pa. 221; 2 Am. L. C., 5th ed. 96–107, 112; Clark v. Russel, 3 Watts, 217.

Where a promise operates as a continuing request, compliance with the request at any time before the promise is withdrawn is a sufficient consideration for the promise: Hamilton v. Ins. Co., 5 Pa. 339; Perkins v. Hadsell, 50 Ill. 216–219; Crosbie v. McDoual, 13 Ves. 148–158.

The existence of a debt is sufficient consideration for the transfer of real or personal property as security or payment; and hence where one who is indebted promises to execute a mortgage or assign a chose in action to the creditor, the contract may be specifically enforced, although unilateral, and nothing is done or promised on the other side: 1 White & Tudor's L. Cas. Eq. 954; Palmer v. Scott, 1 R. & M. 391–394; Corson v. Mulvany, 49 Pa. 88–99.

The ground upon which a chancellor executes an executory contract for the sale of lands, is that equity looks upon things agreed to be done as actually performed ; consequently when an agreement is made for the sale of an estate, the vendor is considered as a trustee for the purchaser of the estate sold, and the purchaser a trustee of the purchase money for the vendor : Kerr v. Day, 14 Pa. 112; Green v. Smith, 1 Atk. 572; Craig v. Leslie, 3 Wheat. 578 ; Seton v. Slade, 7 Ves. Jr. 265.

OPINION BY MR. JUSTICE STERRETT, January 3, 1893 :

This case originated in transactions between the plaintiff and John Rynd, one of the defendants, prior to June 3, 1881, and hence it is not affected by provisions of the act approved on that day.   Nothing was then better settled by a long line of decisions than that a conveyance of land, intended to operate merely as a security for money, was, in effect, a mortgage, not only as between the parties themselves, but also as to those who had notice of the transaction: Guthrie v. Kahle, 46 Pa. 331; McClurkan v. Thompson, 69 Pa. 305.   The reason why such a deed, absolute on its face, might be treated in equity as a mortgage, was because it would be a fraud on the part of the grantee, for example, to hold and use, as *indefeasible*, an instrument which was delivered to and accepted by him as a *defeasible* instrument or mortgage.   The plaintiff in such cases, seeking to reform the instrument, must invoke the equity power of the court, and upon that he must stand or fall.   The burden of proof is upon him ; and it is only upon clear, precise, and indubitable evidence of the fact that the deed was intended by both parties thereto to operate only as a mortgage, that he can succeed in having it so declared by a chancellor : Rowand v. Finney, 96 Pa. 192; Hartley's Ap., 103 Pa. 23.   If the party setting up the defeasance is able to prove the fact by evidence that is not only clear and precise, but at the same time carries with it a conviction of its truth, he is entitled to succeed, notwithstanding there may be rebutting testimony tending to prove the contrary.   Full credence may be given to the testimony on one side, while that on the other may be rejected as unworthy of belief, or, at best, insufficient to create even a serious doubt : Hartley's Ap., supra.   As was said by our late brother CLARK : " Each case must, of course, to a great extent depend upon the

circumstances peculiar to itself; but there are certain indicia of intention which frequently occur, and, when they do exist, are always looked to. Among these are the sufficiency of the price paid; whether or not existing securities or evidences of indebtedness were given up or canceled; whether there was any obligation to repay the purchase money, and whether the grantee entered into immediate possession," etc.: Huoncker v. Merkey, 102 Pa. 462, and authorities there cited.

One of the tests by which to determine whether the conveyance of land in consideration of grantor's indebtedness to grantee is to be deemed an absolute sale or a mortgage, is the effect which the parties intend the conveyance shall have on the indebtedness itself. In 1 Jones on Mortgages, § 267, the subject is discussed thus: "If the indebtedness be not canceled, equity will regard the conveyance as a mortgage, whether the grantee has so regarded it or not. He cannot at the same time hold the land absolutely and retain the right to enforce payment of the debt on account of which the conveyance was made. The test, therefore, in cases of this sort . . . . is to be found in the question whether the debt was discharged or not by the conveyance." To the same effect is Null v. Fries, 110 Pa. 521, in which it was held that an absolute conveyance, in consideration of grantor's indebtedness, etc., may be shown to have been a mortgage if the debt survived. If, however, (as in that case,) the judgments and securities which constituted the consideration for the conveyance are satisfied and canceled, the mere fact that the grantee executed articles of agreement giving the grantor an option to repurchase the property within a certain time will not make the transaction a mortgage.

The substance of the bill and answer and the principal facts of the case sufficiently appear in the report and supplemental report of the learned master. It is therefore unnecessary to restate them here. His inferences of fact and conclusions of law being in favor of plaintiff, he accordingly recommended a decree substantially as prayed for. Sixteen exceptions to the report were filed by defendants. These were fully heard by the learned court, who, upon consideration thereof, sustained five of them, and dismissed the bill, with costs to be paid by plaintiff. The exceptions thus sustained are fully recited in the second to sixth specifications, inclusive. In substance, they

are to the effect that the case, upon the pleadings and the proofs, was insufficient to warrant the master in finding that the deed in question was intended by the parties thereto to operate as a mortgage, and in so treating it in the decree he recommended. After an examination of the record, including the pleadings and the testimony, and due consideration of the same, in the light of the principles applicable to such cases, especially the character and degree of the proof required, we are constrained to the same conclusion that was reached by the learned court below. While there are some indicia of an intention to consider the deed in question as merely security for the money advanced by Rynd, one of the defendants, to pay plaintiff's mortgage debt to the Dollar Savings Bank, the proof is not of that clear, precise and convincing character that is required to move the conscience of a chancellor to reform a deed, absolute on its face, and declare by his decree that the parties thereto intended that it should operate merely as a mortgage. Referring to Rynd's assumption and payment of said mortgage debt, amounting, with interest, to nearly $4,400, plaintiff was asked whether he then or thereafter gave Rynd any obligation or written evidence of indebtedness for the amount thus advanced, or for other money, and his reply was, " No, not that I remember."

The substance of plaintiff's testimony as to his understanding at the time the land was conveyed to Rynd is that the latter would reconvey the same "at any time I could see my way clear to give back his money;" "that was the only promise that was made." In slightly varied forms of expression he repeated this several times. His wife's testimony was to the same effect. In his affidavit of defence filed, in No. 141, October term, 1891, he stated the arrangement thus: "If said affiant should elect to redeem said realty, at any time, that affiant would have the privilege or right so to do, by repaying the amount he, affiant, would owe the said John Rynd. That on the ——— day of May, 1890, affiant elected to redeem said realty, and tendered a certain sum of money for that purpose to both Rynd and Smith."

It is even more than doubtful whether ever such election would have been attempted or tender made if it had not been for the advance in prices of land in the neighborhood, stimulated by developments for oil purposes. It does not appear

that, during the more than nine years preceding, plaintiff had ever seen his "way clear" to give back to Rynd the money he paid or advanced in consideration of the conveyance in April, 1880. Nor does it appear that he was ever under any obligation to repay the same, however clearly he might have seen his way to do so. On the theory of indebtedness, the amount which Rynd would have ·been entitled to receive, when suit was brought, including money advanced to pay the mortgage, the judgment, etc., with interest, would be nearly $10,000.

When Mr. Smith accepted the trust under Mr. Rynd's deed of May 18, 1885, and assumed charge of the farm, plaintiff never suggested that he had any interest therein, or any right to redeem the same; nor did he ever intimate anything of the kind for nearly five years thereafter. On the contrary, after the death of his mother, in 1888, for whom provision was made in the trust deed, plaintiff leased the farm from the trustee, and at one time spoke of buying it. It was not until shortly before this suit was brought, in 1890, that the trustee received any intimation of plaintiff's claim, either from him or from any other source. Plaintiff's equity, if he ever had any, is very stale.

There are other facts and circumstances tending to cast doubt on plaintiff's claim, but it is unnecessary to specify them. It is sufficient to say that his contention is not sustained by that clear, precise and indubitable proof which alone should move a chancellor to declare by his decree that the deed in question was intended by the parties thereto to operate merely as security for the money advanced. We therefore think there was no error in sustaining the five exceptions referred to, and in dismissing the bill at plaintiff's costs.

Decree affirmed, and appeal dismissed, with costs, including costs in the court below, to be paid by appellant.